UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 97-cr-06002-MARTINEZ

UNITED STATES OF AMERICA,

v.

DAVID ANTHONY ROSTAN, JR.,

    Defendant.
_____/

### UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION TO ROSTAN'S MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582

The United States of America, by and through the undersigned Assistant United States Attorney, hereby responds in opposition to movant David Anthony Rostan, Jr.'s ("Rostan") Motion for Compassionate Release (the "Motion") (CRDE 377).[1] The government opposes the Motion because Rostan has not presented "extraordinary and compelling" reasons.[2]

### I.    COURSE OF PROCEEDINGS IN THE UNDERLYING CRIMINAL CASE

On December 9, 1999, Rostan was found guilty by a jury of Counts 1 through 4 of the superseding indictment, which had charged him with knowingly and with intent to defraud used unauthorized access devices, and by such conduct, obtained merchandise and other things of value,

---

[1]    The government will refer to documents in the underlying criminal case as "CRDE," followed by the appropriate docket entry number and the corresponding page number assigned by the electronic docketing system.

[2]    Rostan's Motion, submitted with the assistance of counsel, exceeds, without leave of court, the 20-page limit provided for by the Local Rules. Per Local Rule 7.1(c), "[a]bsent prior permission of the Court, neither a motion and its incorporated memorandum of law nor the opposing memorandum of law shall exceed twenty (20) pages." S.D. Fla. L.R. 7.1(c)(2). Because the Motion does not comply with the Local Rules, the Court may strike Rostan's filing. However, in the interest of judicial efficiency, the government files this response to the merits of the Motion.

in violation of 18 U.S.C. §§ 1029(a)(2) and 2 ("Count 1"); possession of fraudulent immigration documents, in violation of 18 U.S.C. § 1546(a) ("Count 2"); possession with intent to distribute a mixture and substance containing crack cocaine, in violation of 21 U.S.C. § 841(a)(1) ("Count 3"); and possession with intent to distribute a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1) ("Count 4") (CRDEs 24:1–3; 190).

The PSI[3] determined that Rostan's offense level for Counts 3 and 4 was 38 due to the amount of crack cocaine involved – 865.8 grams – and the possession of a dangerous weapon (PSI ¶¶ 34–35, 39). Prior to the trial, the government filed an information pursuant to 21 U.S.C. § 851, advising Rostan that he was subject to a sentencing enhancement under § 841(a)(1) as a result of his two prior qualifying felony convictions (CRDE 175). Rostan objected to the application of the enhancement under § 851 (CRDE 216). As to Count 3, the statutory range of imprisonment was a mandatory life sentence, pursuant to § 841(b)(1) (PSI ¶ 75). Rostan did not object to either the amount of crack cocaine set forth in the PSI or the statutory range of imprisonment (CRDEs 218; 219). The PSI also determined that Rostan had nine criminal history points (among other prior convictions, Rostan has multiple drug-related convictions), resulting in a criminal history category IV (PSI ¶ 61). Based on Rostan's total offense level of 38 and criminal history category of IV, the resulting guideline range was 324 to 405 months of imprisonment (PSI ¶ 76). However, as to Count 3, Rostan was subject to a mandatory term of life imprisonment, pursuant to § 841(b)(1) (PSI ¶ 75).

On March 24, 2000, the Court sentenced Rostan to a term of life imprisonment (CRDE

---

[3]     The version of the presentence investigation report ("PSI") referenced in this response was revised on March 28, 2000. Rostan's counsel objected to paragraphs 3, 5 6, 7, 11, 12, 16, 35, and 57 of the PSI (CRDEs 218; 219).

266).[4] Rostan appealed, and his convictions and sentences were affirmed in an unpublished opinion (CRDE 254).

Rostan then filed his first § 2255 motion, raising two grounds for relief: (1) that trial counsel was ineffective; and (2) that appellate counsel was ineffective (CRDE 257). The district court subsequently denied that first § 2255 motion (CRDE 262).

Rostan thereafter filed a second post-conviction motion, challenging the constitutionality of his convictions and sentences in light of *United States v. Booker*, 543 U.S. 220 (2004) (2-CVDE 1).[5] The Court adopted a report and recommendation recommending that the motion be dismissed as a successive petition, filed without permission from the Eleventh Circuit (2-CVDE 5).

In October 2013, Rostan filed a Rule 60(b)(6) motion (CRDE 321). On December 11, 2014, the Court denied the motion (CRDE 333). On July 29, 2015, the Eleventh Circuit denied Rostan's motion for a certificate of appealability to appeal the denial of his Rule 60(b) motion (CRDE 343). Undeterred, Rostan filed yet another post-conviction motion (CRDE 344). The Court construed the motion as a new proceeding filed pursuant to § 2255 (3-CVDE 1).[6] The 2016 proceeding was dismissed for lack of jurisdiction as it was an improper Rule 60(b) motion and an unauthorized, successive § 2255 motion because Rostan had not first obtained permission from the Eleventh Circuit (3-CVDEs 4; 9). On February 6, 2017, Rostan returned yet again to the Court, filing another

---

[4]     The life sentence consisted of the following: 120 months of imprisonment as to Counts 1 and 2, 360 months of imprisonment as to Count 4, and life imprisonment as to Count 3, all counts to run concurrently with each other (CRDE 266:2).

[5]     Citations to case number 06-60073-cv are designated as ("2-CVDE").

[6]     Citations to case number 16-60783-cv are designated as ("3-CVDE").

§ 2255 motion (4-CVDE 1). [7] On February 28, 2017, the Court entered an order adopting a report and recommendation, recommending that Rostan's motion be dismissed for lack of jurisdiction as a successive, unauthorized § 2255 motion (4-CVDE 7).

On April 13, 2018, Rostan filed a motion requesting a downward departure under 18 U.S.C. § 3553 (CRDE 354). The Court denied the motion based on a lack of jurisdiction (CRDE 356). On March 13, 2019, Rostan filed a motion for a reduction of sentence based on the First Step Act (CRDE 361). In his motion, he argued that his drug offense is a "covered offense" because § 2 of the First Step Act "modified the statutory penalties under 841(b) for violation(s) of 21 U.S.C. [§] 841(a) that involved crack cocaine, which was in fact Rostan's violation" (quotations omitted) (*id.* at 4). He further argued that "[n]o jury found Rostan responsible for any particular quantity of crack. Thus, if the FSA were in effect, Rostan would not be subjected to any mandatory minimum, and so the Court is not restricted in any way when imposing a reduced sentence under Section 404" (*id.* at 7–8). The government filed a response to that motion on March 27, 2019 (CRDE 363), and Rostan replied (CRDE 369). The motion remains pending. On December 27, 2020, Rostan, with the assistance of counsel, filed the instant Motion for Compassionate Release (CRDE 377).

## II.   THE BUREAU OF PRISONS' RESPONSE TO THE COVID-19 PANDEMIC

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period and that has resulted in massive disruption to our society and economy. In response to the pandemic, the Bureau of Prisons ("BOP") has taken significant measures to protect the health of the inmates in its charge.

The BOP has explained that "maintaining safety and security of [the BOP's] institutions is

---

[7]     Citations to case number 17-60291-cv are designated as ("4-CVDE").

[the BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, the BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, the BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts at the Centers for Disease Control ("CDC"), including by reviewing guidance from the World Health Organization. On March 13, 2020, the BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, the BOP has repeatedly revised the Action Plan to address the crisis.

The modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, the BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff

training. All staff and inmates have been and will continue to be issued facemasks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms.

Social and legal visits were stopped on March 13th in order to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, the BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. Further details and updates of the BOP's modified operations are available to the public on the BOP's website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, the BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the BOP, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during

6

the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance the BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, the BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516. On April 3, 2020, the Attorney General gave the Director of the BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, at https://www.bop.gov/coronavirus/. Taken together, all of these measures are designed to sharply mitigate the risks of COVID-19 transmission in a BOP institution. The BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately, and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But the BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad

other factors, including the availability of both transportation for inmates (at a time when interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time when Probation has necessarily cut back on home visits and supervision).

### III.   THE INSTANT MOTION FOR COMPASSIONATE RELEASE

Rostan first asks for a reduction in sentence due to "his advanced age, deteriorating health, exemplary post-offense rehabilitation, and intervening changes in the law" (CRDE 377:1). He notes that he is 67 years old, has served 24 years in prison, has "an almost perfectly clean disciplinary record," and that the prison facility where he is housed "continues to struggle to contain the spread of the active cases" of the virus (*id*. at 2). He then states that he exhausted his administrative remedies by requesting relief to the warden in February 2020, which was subsequently denied (*id*. at 3). Rostan details his release plan by claiming that he will be assisted by a non-profit organization "to help him find housing and employment" (*id*.). He says that his medical conditions, together with his age, place him at greater risk of severe illness if he were to contract COVID-19 (*id*.). Rostan also argues that the "intervening changes in the law and sentencing guidelines," and his "post-offense rehabilitation," further support his request (*id*.).

Rostan then alleges that this Court is not constrained in determining what constitutes "extraordinary and compelling" reasons (*id*. at 6–7). As to his medical conditions, he claims to suffer from depression, anxiety, hyperlipidemia, hypertension, osteoarthritis, hearing loss, and skin lesions (*id*. at 10–13). He says that the BOP is not adequately addressing his medical issues, and that those issues, combined with the threat of the virus and his age, "present extraordinary and compelling circumstances" (*id*.). He states that the CDC has identified certain risk factors to the virus, such as age and hypertension (*id*. at 14–15). Rostan then, in support of his request for relief,

cites to his "exemplary, post-offense conduct" (*id.* at 18–20) and to "[i]ntervening changes in the statutory penalties and sentencing guidelines" (*id.* at 20–27). Finally, he argues that the § 3553 factors support his request for release (*id.* at 27–30). For relief, Rostan asks that the Court "reduce his sentence to time served, and impose a period of home detention as a special condition of his supervised release. This term of home detention could be served at a residential reentry center" (*id.* at 30).[8] Attached to the Motion are a long string cite of cases (CRDE 377-1:1–2), medical records (CRDE 377-2:1–13), a BOP program review (CRDE 377-3:1–4), PATTERN risk score (CRDE 377-4:1), and financial records (CRDE 377-5:1–9).[9]

---

[8]     Rostan's request that this Court order that his remaining sentence be served at home should be denied because this Court has no authority to direct the BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to the BOP's discretion. *See* 18 U.S.C. § 3621(b); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise.").

[9]     Rostan's argument that this Court may independently determine what constitutes an "extraordinary and compelling" reason is wrong. This Court is bound to adhere to the Commission's policy statement. *See Willingham v. United States*, 0:15-cr-60079-COHN, Order on Motion for Compassionate Release (S.D. Fla. August 5, 2020) (DE 148:3–7) (concluding that courts are required by statute to keep to the Sentencing Commission's policy statements). *But see United States v. Cano*, No. 95-00481-CR, 2020 WL 7415833, at *3–4 (S.D. Fla. Dec. 16, 2020).

9

## IV.   LEGAL STANDARD AND ANALYSIS[10]

### a. Rostan's Motion Should Be Denied Because He Has Not Presented Extraordinary And Compelling Reasons[11]

According to medical records, Rostan looks to be in relatively good health, even considering his age. The government's review of medical records revealed nothing that may constitute an "extraordinary and compelling" reason. In fact, a memorandum drafted by Dr. Inerio L. Alarcon cited only to Rostan's degenerative joint diseases and hyperlipidemia as chronic medical conditions.[12] That memorandum, dated May 14, 2020 and addressed to the warden for

---

[10]     The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

(c) **Modification of an Imposed Term of Imprisonment.**--The court may not modify a term of imprisonment once it has been imposed except that--

(1)     in any case--

    (A)     . . . [the court] may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

        (i)     extraordinary and compelling reasons warrant such a reduction . . .
        and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

[11]     Rostan has exhausted his administrative remedies, as required by the statute. Rostan's request was denied by the warden on July 29, 2020. Although there is no indication that Rostan appealed the denial by the warden, 30 days have since elapsed. *See* 18 U.S.C. § 3582(c)(1)(A) ("[t]he court may not modify a term of imprisonment once it has been imposed except that . . . the court, upon motion of the Director of the Bureau of Prisons, *or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier,* may reduce the term of imprisonment.") (emphasis added).

[12]     Given the sensitivity of the documents, the government is sending a motion to the district court seeking authorization to file the administrative exhaustion records, medical records, and medical memorandum under seal.

consideration of compassionate release, ultimately recommended that a reduction in sentence be denied because Rostan's present condition " is stable . . . even though he has chronic medical condition that make him at a high risk of life threatening complication if he were to contract" the virus. The memorandum further explained that Rostan "does not have functional [or physical] impairments. He is able to perform the activities of daily living."

The CDC's current guidance does not include hyperlipidemia as a condition that places a person at greater risk of developing a severe illness due to the virus. *See* https://www.cdc.gov/coronavirus/2019-nCoV/index.html. And although it is true that older adults are at greater risk than younger ones, that fact in itself is not sufficient to qualify as an "extraordinary and compelling" reason, especially when Dr. Alarcon's conclusions are considered. The government submits that the Court need not consider the § 3553 factors in this case because Rostan has not even presented "extraordinary and compelling" reasons in support of his request. However, even if the Court were to consider those factors, it should determine that they do not favor granting relief.

## V.   COVID-19 AND ROSTAN'S COMPASSIONATE RELEASE MOTION

In his Motion, Rostan cites to the COVID-19 pandemic as justification for his release. However, the mere existence of the pandemic, which poses a general threat to every non-immune person in the country, cannot alone provide a basis for a sentence reduction; to put it another way, the analysis of the § 3553 factors or the danger posed by Rostan's release have not substantially changed due to the virus.

As of January 8, 2021, there are 102 active inmate cases and there are 29 active staff member cases of the virus (there have been 137 inmate recoveries, 19 staff recoveries, and one inmate death) of the virus at Miami FCI, Rostan's facility of incarceration. *See*

11

https://www.bop.gov/coronavirus/. Additionally, BOP has instituted numerous measures to mitigate transmission, including the suspension of legal and social visits as well as the implementation of enhanced staff screening and social distancing. The following is a link to the Bureau of Prison COVID-19 Action Plan: https://www.bop.gov/resources/news/20200313_covid-19.jsp. Miami FCI has the capacity to address cases of COVID-19. In sum, the fact that a new virus exists is not grounds to release Rostan or any of the other thousands of incarcerated persons in the United States. Rostan has not presented an "extraordinary and compelling" reason in support of his Motion. This Court should deny his request for relief.

## VI.      CONCLUSION

For the forgoing reasons, Rostan's Motion for Compassionate Release should be denied.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:      *s/ Armando R. Méndez*
ARMANDO R. MÉNDEZ
Assistant United States Attorney
Florida Bar No.: 1010764
99 Northeast 4th Street
Miami, Florida 33132
Telephone: (305) 961-9446
Email: Armando.Mendez@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 11, 2021, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

<u>*s/ Armando R. Méndez*</u>
ARMANDO R. MÉNDEZ
Assistant United States Attorney